**IN THE COUNTY COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
SMALL CLAIMS DIVISION**

| | |
|---|---|
| **Peta-Gaye Morrison,** | |
| *Plaintiff,* | Case Number: |
| v. | |
| **The Iipay Nation of Santa Ysabel,** | *Ad Damnum*: $6,000 + atty fees and costs |
| **Sierra Financial, LLC,** | |
| **Blue Dart Ventures, LLC,** | |
| **Niswi, LLC,** *and* | **JURY TRIAL DEMANDED** |
| **Pinnacle Acquisitions, LLC,** | |
| *Defendants*. | |

## COMPLAINT & DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, **Peta-Gaye Morrison** ("**Ms. Morrison**"), by and through her attorneys, Seraph Legal, P.A., and complains of the Defendants, **The Iipay Nation of Santa Ysabel** ("**Iipay Nation**"), **Sierra Financial, LLC** ("**Sierra Financial**"), **Blue Dart Ventures, LLC** ("**Blue Dart**"), **Niswi, LLC** ("**Niswi**"), **Pinnacle Acquisitions, LLC** ("**Pinnacle**"), and **Kraken Holdings, LLC** ("**Kraken**"), (collectively, the "**Defendants**"), stating as follows:

## PRELIMINARY STATEMENT

1.     This is an action brought by Ms. Morrison against the Defendants for violations of the *Fair Credit Reporting Act*, 15 U.S.C. § 1681, *et. seq.* ("**FCRA**").

## JURISDICTION AND VENUE

2.     Jurisdiction arises under the FCRA, 15 U.S.C. § 1681p, and Section 34.01, Florida Statutes.

3.     The Defendants are subject to the provisions of the FCRA and are subject to the jurisdiction of this Court pursuant to Section 48.193, Florida Statutes.

4.      Venue is proper in Hillsborough County, Florida, because the acts complained of were committed and / or caused by the Defendant within Hillsborough County.

## PARTIES

### Ms. Morrison

5.      **Ms. Morrison** is a natural person residing in Tampa, Hillsborough County, Florida and is a *Consumer* as defined by 15 U.S.C. § 1681a(c).

### Iipay Nation and Sierra Financial

6.      **Iipay Nation** is a federally-recognized tribe of the Kumeyaay Nation located in southern California.

7.      **Sierra Financial** is a limited liability company which conducts online lending via its website, www.sierrafinancial.net.

8.      Sierra Financial purports to be a sovereign enterprise of Iipay Nation, located at **100 Schoolhouse Canyon Rd., Santa Ysabel, CA 92070.**

9.      Sierra Financial, through its website www.sierrafinancial.net, "offers easy payday and installment loans online with guaranteed and instant approval."

10.     These loans charge interest rates as high as 1,500% Annual Percentage Rate ("**APR**").

### Blue Dart

11.     **Blue Dart** is a Kansas limited liability company with a primary business address of **8900 Indian Creek Pkwy Suite 300, Overland Park, KS 66210.**

12.     Blue Dart describes itself as "a solutions company for businesses big and small providing marketing, compliance, human resources, technology, and accounting services."

13.     In reality, Blue Dart services the payday loan industry, supplying the capital to make the "tribal" loans.

14.     Blue Dart is not registered to conduct business in the State of Florida.

15.     Blue Dart's Kansas registered agent is **Rak Services, Inc., 4200 Somerset Drive Suite 208, Prairie Village, KS 66208**.

## Niswi

16.     **Niswi** is a limited liability company which conducts online lending via its website, www.lendumo.com.

17.     Niswi, through LendUMo, provides online payday loans to consumers at interest rates in excess of 700% annually.

18.     Niswi claims to be a commercial enterprise and instrumentality of the Lac du Flambeau Band of Lake Superior Chippewa Indians, a federally recognized sovereign Indian nation (the "LDF Tribe").

## Pinnacle, formerly known as Soaren Management

19.     **Pinnacle** is a Delaware limited liability company who can be served at **Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808**.

20.     Pinnacle previously merged with another Delaware limited liability company, Soaren Management, LLC, who operated from 20830 N. Tatum Blvd., Suite 115, Phoenix, AZ 85050.

21.     Alternatively, Pinnacle purchased Soaren but is a mere continuation of Soaren.

22.     Pinnacle, along with its subsidiaries and investors, is the true beneficial owner of Niswi, along with its LendUMo website.

## FACTUAL ALLEGATIONS

### Usurious Loans Prohibited in Florida

23.     The State of Florida has long recognized that lending money at usurious interest rates is immoral, harmful, and contrary to public policy.

24.     Section 687.071, Florida Statutes renders the issuing of a loan with annual interest rates **greater than 45%** a felony.

25.     Section 687.071(7), Florida Statutes renders any such usurious loan unenforceable in Florida, sating "No extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state."

26.     Florida's usury statutes "protect against the oppression of debtors through excessive rates of interest charged by lenders." *Sheehy v. Franchise Tax Bd.*, 84 Cal.App.4th 280, 283, 100 Cal. Rptr. 2d 760 (2000). Any person who willfully makes such a loan, in addition to criminal sanctions, forfeits the right to collect payment for the loan, as such loans are "void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

27.     Many other states take views similar to Florida's. "Suffice to say that [the purpose of usury law] is to protect the necessitous borrower from extortion. In the accomplishment of this purpose a court must look squarely at the real nature of the transaction, thus avoiding, so far as lies within its power, the betrayal of justice by the cloak of words, the contrivances of form, or the paper tigers of the crafty." *Wilcox v Moore*, 354 Mich. 499, 504 (1958).

### Origins of LDF Holdings and Tribal Payday Loan Operations

28.     As aforementioned, Niswi claims to be a commercial enterprise and instrumentality of the LDF Tribe.

29.     In 2010, the LDF Tribe defaulted on a $50 million bond, the proceeds of which were used to fund a failed casino. *See* "Judge Refuses to Name Receiver for Casino," Milwaukee *Journal Sentinel,* Jan. 10, 2010.

30.     Facing dire economic circumstances, the Tribe looked for other ways to shore up its finances, including establishing a payday lending operation, which would lend money to consumers at astronomically high interest rates, generally at interest rates over 700% annually.

31.     However, given the Tribe's poor economic situation and credit history, it was unable to obtain credit from traditional sources to fund its new payday lending operations.

32.     The Tribe had no experience in payday lending or knowledge of how to underwrite, collect on, or service payday loans.

33.     An article published in the Tribe's newsletter, *Inwewin*, in July 2013 noted that the Tribe would be embarking on a **new** internet lending business. The article stated "some view payday loan and internet lending businesses as predatory, with companies taking advantage of individuals already in unpleasant financial situations." The article also stated that "the Tribe has partnered with one of the largest and most experienced lending companies," although it did not state who this "partner" was.

34.     Lacking both capital and experience, and in desperate need of money, the Tribe rented out one of its few remaining assets,  its sovereign immunity, to many different non-tribal persons and entities who agreed to pay the Tribe a small percentage of each loan – under 5% – as a fee or commission.

35.     Such arrangements are often referred to as "Rent-A-Tribe" agreements.

36.     In "Rent-A-Tribe" schemes, non-tribal payday lenders attempt to circumvent state and federal laws which prohibit usurious loans from being issued and criminalize such practices.

They do this by issuing loans in the name of a Native American tribal business entity or entities that purport to be shielded from state and federal law via tribal sovereign immunity.  In reality, the tribal lending entity is usual a mere "front" for an illegal lending scheme; all substantive aspects of the payday lending operation (*e.g.*, financial backing, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections) are performed by individuals and entities that are unaffiliated with the Native American tribe. In exchange for "renting" its sovereign immunity to the individuals and entities running the payday lending scheme, the cooperating Native American tribe receives a fraction of the revenues generated; while the percentage varies from scheme-to-scheme, the number is almost always in the single digits.

37.     Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted two people who had ran a network of tribal lending operations, Scott Tucker and Timothy Muir, on 14 felony counts brought against them; *see United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). While the individuals and Native American entities in this case were different, the underlying scheme is substantially identical: payday lenders taking advantage of people by charging unlawfully high interest rates – often exceeding 700% – through sham entities that purport to be operated by Native American tribes, but in reality, are controlled by non-tribal individuals and entities that control and manage all substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation.

38.     LDF does not lend to members of its own tribe, nor does it make loans to Wisconsin residents, a business decision made in hopes that it would keep Wisconsin state regulators from intervening. Indeed, Brent McFarland, the Tribe's director of business development, told the

Milwaukee *Journal Sentinel* that by not lending to Wisconsin residents, "It keeps our relationship with the state of Wisconsin healthy."

39.     McFarland also told the *Journal Sentinel* that "we're looking for ways to leverage (the tribe's) sovereignty" for profit.

40.     Indeed, LDF has *many* non-tribal "partners" that perform the majority of the work required to originate, service and collect payday loans.

41.     The capital used to fund these loans comes from non-tribal sources, including Pinnacle and Kraken.

42.     The process is relatively straight-forward: the Tribe mints a new "tribal" limited liability company, supposedly organized under Tribal law, for each new investor, and each new investor runs his or her own "tribally owned" website, offering consumers loans at interest rates between 450% and 1100% annually. Most of the LLCs are named after words in the Ojibwe language; Niswi means "three."

43.     The LDF Tribe has created dozens of "tribal" companies, all of which are beneficially owned by non-Tribal businessmen and businesswomen – many of whom have engaged in questionable business practices in the past.

44.     Despite supposedly owning these different payday loan websites, which transact tens of millions of dollars in total revenues per month, each and every LDF Holdings website states the business office to be at the same location: 597 Peace Pipe Rd., 2nd Floor, Lac Du Flambeau, WI 54538. This address is a small building, the first floor of which is the LDF Smoke Shop.

45.     Beyond this, the CEO of LDF Holdings, Jessi Lee Phillips Lorenzo, lives in an upscale apartment complex in the Hyde Park area of Tampa and maintains a LinkedIn profile

which states she worked for Triax Management & Dater Portflio between August 2015 and December 2016.

46. Lorenzo's description of the company telegraphs her former employer's business model of selling sovereign immunity to non-tribal business owners, stating her position was "**Director Of Sovereign Sales**" and explaining "In today's ***regulatory environment*** it is very important to do business with people that will do things the right way. Triax and Dater have been building very successful businesses over the past 5 years. Our success formula is simple: ***Identify Great Tribes, Financiers, Servicers and Best in Class Legal Teams*** and have them work cooperatively to build a very profitable compliant business based upon consumer satisfaction." (Emphasis added.)

47. The frequency with which LDF Holdings creates tribal corporations specifically to benefit particular non-tribal individuals, combined with the fact the CEO of LDF Holdings is a non-tribal member apparently hired for her expertise in crafting "rent-a-tribe" agreements heavily suggests that LDF Holdings is simply more of a sovereign immunity rental agency than a lender.

48. While the Tribe has some nominal involvement in Niswi, as well as the other cheaper-by-the-dozen "Tribal" lending companies, and a handful of Tribal members are employed in payday lending, the real management, control, and financial benefit rests with non-tribal entities, e.g. Pinnacle and Kraken.

49. Pinnacle, presently and previously through its predecessor-in-interest, Soaren, has engaged in other "rent-a-tribe" deals to operate other similar payday loan websites it owns, such as TargetCashNow.com.

**Pinnacle, through Soaren, Obtained Credit Report Without Permissible Purpose**

50.     On November 28, 2018, Soaren obtained Ms. Jones' ***Credit Bureau Report*** ("**CBR**") from FactorTrust, Inc. ("**FactorTrust**"), a nationwide Consumer Credit Reporting Agency ("**CRA**"). **SEE PLAINTIFF'S EXHIBIT A.**

51.     FactorTrust, in turn, obtained supplemental information from Trans Union, LLC, another CRA ("**Trans Union**"). **SEE PLAINTIFF'S EXHIBIT B.**

52.     Although Soaren obtained the report, it falsely certified to FactorTrust, and thus Trans Union, that the party requesting the report was "Niswi" of 597 Peace Pipe Rd., 2nd Floor, in Lac du Flambeau, Wisconsin, even though it was Soaren in Arizona who requested the report.

53.     FactorTrust recorded the inquiry having been made by "Niswi/Amplify Funding," 20830 N. Tatum Blvd., Suite 115, Phoenix, AZ 85050; phone: 480-550-8178; email: info@**soaren-management.com**.

54.     At the time of the inquiry, Soaren was aware that Ms. Morrison was a Tampa resident, that she maintained a bank account in Tampa, that she worked in Hillsborough County, and that it was requesting a detailed credit report to determine Ms. Morrison's eligibility for a loan to be made by wiring money to Tampa.

55.     Further, at all times relevant, Soaran operated an interactive website which was frequently accessed by consumers in Florida, relating to its payday loans.

56.     Operation of an interactive website like amplifyfunding.com is a factor which tends to establish personal jurisdiction over a defendant in the forum state. *Toys "R" Us, Inc., v. Step Two*, 318 F.3d 446, 454 (3rd Cir. 2003).

57.     At no point did Ms. Morrison apply for any loan with Soaren, LendUMo, or similar, or otherwise consent to Soaren obtaining a CBR regarding her.

58.     Soaren purchased Ms. Morrison's basic personal information – name, address, date of birth, employer, and a few other details – from an online "lead generator."

59.     Many of these lead generators use misleading and false statements to hoodwink unsuspecting consumers into providing personal information about themselves. These lead generators then re-sell the information to illegally operating payday lenders like Bright Lending, who then seek to qualify their new "leads" by obtaining highly detailed credit reports on the consumer's spending and financial behavior from CRAs such as FactorTrust, ChexSystems, Inc., DataX LLC, and Clarity Services, Inc.

60.     The CFPB has brought complaints against a number of "lead generators" who it has alleged duped consumers into providing personal information about themselves, then re-sold these leads to online payday lenders that they knew were operating illegally. *See e.g. In the Matter of Zero Parallel,* 2017-CFPB-0017

61.     By way of example, Zero Parallel, LLC, ran an affiliate program in which independent website operators funneled leads to it. Zero Parallel paid between $2 and $220 per lead, reselling these leads to a multitude of online loan sharks, most of whom claim sham tribal affiliations.

62.     Once the leads are purchased from an online lead generator, online payday lenders such as Soaren, as Amplify Funding, use sophisticated predictive algorithms to determine which consumers are likely to make loan payments *and* are likely to accept a loan on unfavorable terms.

63.     Through thus use of these algorithms, online payday lenders like Soaren can determine – often quite accurately – which consumers are in the "sweet spot" of having the ability to make loan payments for a period of months, but also show signs they are likely to accept loan terms calling for triple-digit interest rates.

64.     While conventional wisdom would dictate only the most desperate of the desperate would take a loan out carrying a 500% interest rate, research done by Matt Komos, Trans Union's Vice President of Research and Consulting, indicates 30% of borrowers obtaining online payday loans at triple-digit interest rates have prime (credit scores over 661), or super-prime (e.g. credit scores over 781) credit, and many could have easily qualified for traditional bank credit at single-digit interest rates. "Consumers have gotten comfortable with this short-term product, they like to use it," Komos said of borrowers who use payday and alternative loan financing.   See https://www.finder.com/transunion-payday-loan-borrowers-may-qualify-for-bank-loans (Accessed March 23, 2020).

65.     Once identified, qualified consumers are bombarded with a flood of advertising emails, text messages, automated sales phone calls, and more, playing up the "quick and easy" loan terms offered, with no mention of the true cost of the loan.

66.     Pinnacle, as successor-in-interest to Soaren, is liable for Soaren's aforementioned conduct.

### Sierra Financial and Iipay Nation

67.     As noted above, Sierra Financial offers loans via its website, sierrafinance.com.

68.     Sierra Financial's loans charge interest rates well in excess of 700% annually.

69.     The website is supposedly owned and operated by the Iipay Nation.

70.     In reality, the lending enterprise is one of many beneficially owned by Jeremy Shaffer ("**Shaffer**"), Steve Mitchem, Josh Mitchem, and Blue Dart.

71.     Blue Dart, in Overland Park, Kansas, has "rent-a-tribe" agreements with several Native American tribes, including the Iipay Nation.

72.     Steve Mitchem moved to the Kansas City area in the 1980s and was a full-time minister at the Church of the Nazarene. In the 1990s, he left spiritual riches for more earthly ones selling jewelry for the luxury purveyor, Tivol. Despite eventually becoming the retailer's president, Mitchem left for something even more profitable than selling Rolexes: online payday lending.

73.     Mitchem's son, Josh, owned dozens of online payday lenders, most of which were supposedly "offshore" in St. Kitts and Nevis.

74.     Josh Mitchem was sued by the Arkansas State Attorney General in 2012, who alleged Josh Mitchem's cheaper-by-the-dozen offshore limited liability companies ("LLCs") existed only to provide cover for his illegal lending business.

75.     The Arkansas lawsuit states: "The purpose of these LLCs is to make it appear as if the Defendants are not the actual payday lenders and to otherwise shield Defendants from liability from lawsuits such as the one brought by the Attorney General in this case…the Defendants make the decisions concerning all lending operations from their offices in the Kansas City, MO area."

76.     Mitchem paid $80,000 to settle the matter and agreed to stop making loans in Arkansas.

77.     In 2010, Josh Mitchem, Steve Mitchem and Shaffer formed Rare Moon Media, LLC ("**Rare Moon**").

78.     Rare Moon operated a web of interrelated companies offering online payday loans at 600% annual interest rates and higher; including SCS Processing, a/k/a Everest Cash Advance, and BD PDL Services, a/k/a Bottom Dollar Payday.

79.     Rare Moon's 2016 annual report to the Kansas Secretary of State, dated April 5, 2017, indicates its mailing address was ***8900 Indian Creek Parkway, Suite 300, Overland Park, KS 66210.*** **SEE PLAINTIFF'S EXHIBIT C.**

80.     Rare Moon appears to have ceased operations in or around 2016.

81.     Around this time Blue Dart began operations.

82.     Blue Dart has the same officers as Rare Moon – it is owned by Steve Mitchem, its Executive Vice President is Shafer and its Chief Operating Officer is Josh Mitchem. **SEE PLAINTIFF'S EXHIBIT D.**

83.     Blue Dart maintains an office at the same location used by Rare Moon: 8900 Indian Creek Parkway, Suite 300, Overland Park, KS 66210. **SEE PLAINTIFF'S EXHIBIT E.**

84.     The online resumes of key employees, like Bethanie White, Director of Marketing, indicate their employment with Rare Moon stopped right as their employment with Blue Dart began. **SEE PLAINTIFF'S EXHIBIT F.**

85.     However, unlike Rare Moon, who created sham offshore companies in the West Indies, Blue Dart instead operates sham "rent-a-tribe" models, using the Iipay Nation and the Flandreau Santee Sioux Tribe in South Dakota.

86.     Despite the tribes' alleged ownership, Blue Dart is the true entity responsible for buying leads, obtaining CBRs to qualify those leads, underwriting, servicing, and collecting loans made, and more.

87.     Blue Dart and its non-Tribal investors and affiliates supply the capital to make the "tribal" payday loans and retain the overwhelming majority of profits from the lending business.

88.     Blue Dart and its non-Tribal investors thus control the business and stand to benefit the most from the business.

**Blue Dart, as 'Sierra Financial' Obtains CBR Without Permissible Purpose**

89.     On November 28, 2018, Sierra Financial twice requested and obtained a CBR from FactorTrust. **SEE PLAINTIFF'S EXHIBIT A.**

90.     FactorTrust, in turn, obtained supplemental information from Trans Union regarding Ms. Morrison.  **SEE PLAINTIFF'S EXHIBIT B.**

91.     Although Blue Dart obtained the report, it falsely certified to FactorTrust, and thus Trans Union, that the party requesting the report was "Sierra Financial" in Santa Ysabal, California, even though it was Blue Dart in Kansas who requested the report.

92.     One of the inquiries recorded by Trans Union shows the phone number associated with the inquiry is (913) 951-8339.

93.     The area code for Overland Park, Kansas is 913 and the phone number belongs to, or is utilized by, Blue Dart.

94.     Trans Union recorded the two requests for CBRs regarding Ms. Morrison as having been certified permissible because the reports were for account review of a "credit transaction." *Id.*

95.     However, Ms. Morrison never applied to Blue Dart or Sierra Financial for credit.

96.     Despite its statement that its request was for account review of a credit transaction, Ms. Morrison has no account with Blue Dart or Sierra Financial and thus no permissible purpose existed to obtain a report.

97.     Records from FactorTrust show Sierra Financial also obtained a CBR directly from FactorTrust on November 28, 2018 and again on February 11, 2019. **SEE PLAINTIFF'S EXHIBIT B.**

98.     The 2018 inquiry was coded as a "hard" inquiry, e.g., one which impacts the consumer's credit score and is included in reports sold to other lenders.

99.     For the same reasons as aforementioned, no permissible purpose existed to obtain the report from FactorTrust.

100.    Blue Dart and/or Sierra Financial obtained Ms. Morrison's basic information – her name, address, date of birth, checking account number, employment information, etc. – from one of the myriad "online lead generators" which permeate the internet.

101.    Iipay Nation's main contribution to the business is to facilitate the making of usurious loans to consumers in states which prohibit usury, such as Florida, under the cloak of supposed tribal sovereign immunity.

102.    Even the few employees who work for Sierra Financial in the Santa Ysabel office work under the control and direction of Blue Dart.

103.    However, the Iipay Nation is fully aware – and id compensated for – the fact unauthorized credit inquiries are obtained in the name of lenders it "owns." The Iipay Nation has agreed to allow Blue Dart to obtain CBRs in its name for any reason Blue Dart deems fit, and is aware that most, if not all, of the inquiries will be in contravention to the FCRA's permissible purpose requirements.

104.    Blue Dart, through Sierra Finance, also operates Tallgrassfinance.com, which states that it has a European Union address, where it operates as Sierra Financial LTD, 11 River Street, Newry, Co. Down, Northern Ireland, BT34 2DQ.

105.    This address is not on tribal land nor does it have any affiliation with Iipay Nation whatsoever; rather, it is a forwarding address utilized by many other circumspect internet-based businesses to create the façade they are not located in the United States.

106.     Rather than enriching Iipay Nation's treasury, Sierra Financial's loan revenue primarily enriches non-tribal entities and non-tribal members, who receive the overwhelming bulk of revenues and profits, while Iipay Nation receives only a small fraction of the revenues.

107.     Blue Dart and Sierra Financial are thus not entitled to the protections of sovereign immunity.

108.     Further, these loans are usurious and unenforceable in the state of Florida, and their collection constitutes a felony under Florida law. In an attempt to avoid criminal and civil prosecution for violation of state usury laws, Sierra Financial claims that the actual entity offering the loans is their Native American tribe, and that they fall within the protections of the tribe's sovereign immunity.

109.     Even assuming *arguendo* that Ms. Morrison had applied for credit with Sierra Financial or Niswi, such loans would be void *ab initio* under Florida law due to the usurious interest rates, and Blue Dart/Sierra Financial and Pinnacle/Niswi would still lack a permissible purpose to obtain a CBR regarding Ms. Morrison.

110.     Ms. Morrison has hired the aforementioned law firm to represent her in this matter and has assigned her right to fees and costs to such firm.

## COUNT I
## BLUE DART'S VIOLATIONS OF 15 U.S.C. §§ 1681b(f) and 1681q

111.     Ms. Morrison adopts and incorporates paragraphs 1 – 110 as if fully stated herein.

112.     Blue Dart violated 15 U.S.C. § 1681q when it obtained a CBR regarding Ms. Morrison on at least **four occasions** – twice from FactorTrust and twice from Trans Union – under the false pretenses that the reports were actually requested by Sierra Financial.

113.    Blue Dart violated 15 U.S.C. § 1681b(f), when Blue Dart, on at least **four occasions** – twice from FactorTrust and twice from Trans Union – requested and obtained a CBR regarding Ms. Morrison without a permissible purpose and with a false certification that the credit pull was in connection with a credit transaction involving Ms. Morrison, as Ms. Morrison does not have an account, and never applied for credit with Sierra Financial, Blue Dart or the Iipay Nation and even had she applied for any such loan, the loan would be void ab initio pursuant to Florida Law.

114.    Blue Dart's actions were willful and intentional, as it knew, or reasonably should have known, that no permissible purpose exists to obtain reports for loans rendered illegal under Florida law and that they are legally obligated to disclose the name of the entity for which they were requesting the reports.

115.    Blue Dart intentionally failed to disclose that Blue Dart was the entity requesting and utilizing the credit report in an attempt to invoke the tribe's sovereign immunity.

116.    Blue Dart is liable for the above-stated violations of the FCRA, and Ms. Morrison is thereby entitled to an award of statutory damages not to exceed $1,000 for each violation.

**WHEREFORE,** Ms. Morrison respectfully requests this Court to enter judgment against Blue Dart for:

a.    The greater of statutory damages of **$1,000.00** per incident pursuant (for a total of **$4,000**) to 15 U.S.C. § 1681n(a)(1)(A) or Ms. Morrison' actual damages;

b.    Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

c.    Such other relief that this Court deems just and proper.

**COUNT II**
**BLUE DART, SIERRA AND IIPAY'S JOINT AND SEVERAL**
**VIOLATIONS OF THE FCRA**

**Pled in the alternative to Count I**

117.    Ms. Morrison adopts and incorporates paragraphs 1 – 110 as if fully stated herein.

118.    Alternatively, Blue Dart, Sierra Financial and Iipay Nation violated 15 U.S.C. § 1681b(f), when Blue Dart, on at least **four occasions** – twice from FactorTrust and twice from Trans Union – requested and obtained a CBR regarding Ms. Morrison on behalf of Sierra Financial and Iipay Nation without a permissible purpose and with a false certification that the credit pull was in connection with a credit transaction involving Ms. Morrison, as Ms. Morrison does not have an account, and never applied for credit with Sierra Financial, Blue Dart or the Iipay Nation and even had she applied for any such loan, the loan would be void ab initio pursuant to Florida Law.

119.    Blue Dart, Sierra Financial and Iipay Nation's actions were willful and intentional, as they knew, or reasonably should have known, that Ms. Morrison's information was obtained from a lead generator and that she did not apply for credit with Sierra Financial.

120.    Blue Dart, Sierra Financial and Iipay Nation also knew, or should have known, that no permissible purpose exists to obtain reports for loans rendered illegal under Florida law.

121.    Blue Dart was acting on behalf of Sierra Financial and Iipay Nation, and within the scope of its authority. Sierra Financial and Iipay Nation, as principals, are liable for the actions of its agent, Blue Dart.

122.    Blue Dart, Sierra Financial and Iipay Nation are jointly and severally liable for the above-stated violations of the FCRA, and Ms. Morrison is thereby entitled to an award of statutory damages not to exceed $1,000 for each violation.

**WHEREFORE,** Ms. Morrison respectfully requests this Court to enter judgment against Blue Dart, Sierra Financial and Iipay Nation, jointly and severally, for:

a.      The greater of statutory damages of **$1,000.00** per incident pursuant (for a total of **$4,000**) to 15 U.S.C. § 1681n(a)(1)(A) or Ms. Morrison' actual damages;

d.      Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

e.      Such other relief that this Court deems just and proper.

### COUNT III
### NISWI AND PINNACLE'S JOINT AND SEVERAL
### VIOLATIONS OF THE FCRA

123.    Pinnacle and Niswi, violated 15 U.S.C. § 1681b(f), which prohibits obtaining a consumer report except for a purpose for which the report is authorized and the purpose has been certified by the prospective user, when Soaren, claiming to be Niswi, either willfully and intentionally or recklessly and without regard for a consumer's rights, requested credit reports regarding Ms. Morrison on **two** occasions by falsely claiming that the information was needed for review of an account regarding a "credit transaction." No such account review was ever intended as no account with Soaren, or Niswi exists.

124.    Soaren had purchased Ms. Morrison's basic personal information from an online lead generator and obtain credit reports without Ms. Morrison's knowledge or consent to "pre-qualify" her for a loan.

125.    Pinnacle is liable as the successor-in-interest to Soaren.

126.    The actions and omissions of Soaren and Niswi were willful and intentional, as they knew, or reasonably should have known, that no permissible purpose to obtain reports for loans rendered illegal under Florida law of their duty to disclose the name of the entity for which they

were requesting the reports, and they intentionally failed to disclose this information, and also because they affirmatively stated that they were requesting a report for "account review" even though no account existed to review – an act which they could not have performed accidentally.

**WHEREFORE,** Ms. Morrison respectfully requests this Court to enter judgment against Pinnacle and Niswi, jointly and severally, for:

a.      The greater of statutory damages of **$1,000.00** per incident pursuant (for a total of **$2,000**) to 15 U.S.C. § 1681n(a)(1)(A) or Ms. Morrison' actual damages;

b.      Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

c.      Such other relief that this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Ms. Morrison hereby demands a jury trial on all issues so triable.

Respectfully submitted on August 24, 2020, by:

/s/ *Bryan J. Geiger*
Bryan J. Geiger, Esq.
FL Bar # 119168

**SERAPH LEGAL, P. A.**
2002 E. 5th Ave., Suite 104
Tampa, FL 33605
Tel: 813-567-1230
Fax: 855-500-0705
BGeiger@SeraphLegal.Com
Counsel for Plaintiff

**<u>EXHIBIT LIST</u>**

| | |
|---|---|
| **A** | **Plaintiff's FactorTrust Consumer Disclosure, February 17, 2020, Inquiry Excerpt** |
| **B** | **Plaintiff's Trans Union Consumer Disclosure, April 12, 2020, Inquiry Excerpt** |
| **C** | **Rare Moon's 2016 Annual Report** |
| **D** | **Blue Dart's Website Screenshot, May 31, 2020** |
| **E** | **Better Business Bureau® Report on Blue Dart** |
| **F** | **LinkedIn Resume of Bethanie White** |

# EXHIBIT A
## Plaintiff's FactorTrust Consumer Disclosure, February 17, 2020, Inquiry Excerpt

FactorTrust                                                 https://www.factortrust.com/consumer/Report.aspx



**INQUIRIES INITIATED BY CONSUMER ACTION**

Inquiries Initiated By Consumer Action refers to inquiries resulting from a transaction initiated by you. These include applying for a credit card or completing an application at a financial institution. Please note that the inquiries are part of your credit history and may be included in our reports to others.

| Date | Customer ID | Name | Consumer Contact | Dispute Date |
|------|-------------|------|------------------|--------------|
| 11/28/2018 | 3599 | Sierra Financial, LLC | PO Box 647<br>Santa Ysabel, CA 90070<br>855-435-8248<br>customerservice@indservicesllc.com | |
| 11/28/2018 | 3430 | Niswi dba Lendumo | 597 Peace Pipe Rd<br>2nd Floor<br>Lac du Flambeau, WI 54538<br>8775581999<br>customerservice@lendumo.com | |
| 11/28/2018 | 3429 | Niswi dba Lendumo | 597 Peace Pipe Rd<br>2nd Floor<br>Lac du Flambeau, WI 54538<br>8775581999<br>customerservice@lendumo.com | |

**PROMOTIONAL INQUIRIES**

The companies listed received your name, address and other limited information about you so they could make a firm offer of credit or insurance. They did not receive your full credit report. These inquiries are not seen by anyone but you and do not affect your score.

| None |
|------|

**ACCOUNT REVIEW INQUIRIES**

The listing of a company's inquiry in this section means that they obtained information from your credit file in connection with an account review or other business transaction with you. These inquiries are not seen by anyone but you and will not be used in scoring your credit file (except insurance companies may have access to other insurance company inquiries, certain collection companies may have access to other collection company inquiries, and users of a report for employment purposes may have access to other employment inquiries, where permitted by law).

| Date | Customer ID | Name | Consumer Contact |
|------|-------------|------|------------------|
| 02/11/2019 | 2987 | Sierra Financial, LLC | PO Box 647<br>Santa Ysabel, CA 90070<br>855-435-8248<br>customerservice@indservicesllc.com |

# EXHIBIT B
## Plaintiff's Trans Union Consumer Disclosure, April 12, 2020, Inquiry Excerpt





**CUSTOMER 2987 via FTSIERRA FINANCIAL**
100 SCHOOLHOUSE CANYON RD
SANTA YSABEL, CA 92070
(913) 951-8339

Requested On: 11/28/2018

**CUSTOMER 3659 via FTSIERRA FINANCIAL**
P.O. BOX 647
SANTA YSABEL, CA 92070
(855) 556-9477

Requested On: 11/28/2018

**CUSTOMER 3487 via FACTORTRUST INCNISWI DBA**
597 PEACE PIPE RD 2ND FLO
LAC DU FLAMBEAU, WI 54538
(877) 558-1999

Requested On: 11/28/2018

**Credit Report Messages**

Your credit report contains the following messages.

Page 28 of 31

# EXHIBIT C
## Rare Moon's 2016 Annual Report

**Limited Liability Company Annual Report**



1. LLC Name: RARE MOON MEDIA, LLC
2. Business Entity ID No.: 6427686
3. Tax Closing Date: December  2016
4. State of Organization: KS
5. Official Mailing Address:
   8900 Indian Creek Pkwy Suite 300, Overland Park KS 66210

6. Members who own 5% or more of capital (Kansas LLCs only):

   Jeremey D. Shaffer, Trustee - 11214 Renner Blvd   Lenexa, KS 66219

Federal Employer Identification Number (FEIN): 0272544675

"I declare under penalty of perjury pursuant to the laws of the state of Kansas that the foregoing is true and correct."

Executed on April 05 2017

Signature of Member: Jeremy Shaffer

Electronic File Stamp
Information:

Filed

* Date: 04/05/2017
* Time: 02:09:54 PM

KANSAS SECRETARY OF STATE NON-CERTIFIED WEB COPY 5/31/2020 4:50:50 PM

# EXHIBIT D
## Blue Dart's Website Screenshot, May 31, 2020

5/31/2020                                    Team | bluedart

    ABOUT        JOBS        SERVICES        CLIENTS        CONTACT



## OUR
## TEAM

The 'About Us' paragraph doesn't give justice to the amazing minds
and talent that power BlueDart .

Meet the faces behind the emails and phone numbers.



## OUR
## Leadership
## TEAM



Steve Mitchem     DeWayne Bridges     Steve St. Arnold     Jeremy Shaffer     Josh Mitchem
Owner                Co-owner              President          EVP, Business        COO
                                                                Development

https://www.bluedartventures.com/team                                                    1/4

# EXHIBIT E
## Better Business Bureau® Report on Blue Dart



# EXHIBIT F
## LinkedIn Resume of Bethanie White

**Linked**in

Join now    **Sign in**

Bethanie White



# Bethanie White

Director of Marketing at Blue Dart Ventures, LLC

Kansas City, Missouri · 500+ connections

Join to Connect

 **Blue Dart Ventures, LLC**

 **University of Kansas**

 Websites

## About

Personally, I strive to grow in the marketing field and develop my skills on a daily basis. I am team and detail-oriented and strive to make every decision one that is made with integrity.

Energetic and driven, I thrive when I have multiple irons in the fire and a fun team to work with.

Knowledge Base:
Mobile Marketing
Pay-Per-Click (PPC)
Search Engine Optimization (SEO)
Social Media Marketing (SMM)
Customer Service
Project Management
Content Writing
Sales and Business Development
Lead Generation
Affiliate Marketing

# EXHIBIT F
## LinkedIn Resume of Bethanie White

**Linked**in                                                    Join now      Sign in

Bethanie White

## Activity



**Veterans on the front line of the incoming cannabis industry**
Liked by Bethanie White



**Blue Key CBD**
Liked by Bethanie White



**Green Elevation aims to elevate industry, putting patient safety first**
Liked by Bethanie White

Join now to see all activity

## Experience



**Director of Marketing**
Blue Dart Ventures, LLC
Jan 2015 — Present · 5 years 5 months
Lenexa, Kansas



**Affiliate & Mobile Marketing Manager**
Rare Moon Media
Aug 2011 — Jan 2015 · 3 years 6 months
Kansas City, Missouri Area